## 9816

### DOWLING v. SEABOARD AIR LINE RY. *ET AL.*

#### (93 S. E. 863.)

1. Carriers—Conversion.—There is a conversion, where the consignee, after fruitless efforts at adjustment, makes unconditional offer to pay all the carrier's charges, and it refuses the money and sells the goods.

2. Carriers—Conversion—Filing of Claim.—The provision of a bill of lading, requiring as condition to liability of carrier, the filing of claims for loss, damage, or delay, has no application in action for conversion by the carrier, refusing tender of all charges and selling the goods.

3. Commerce—Recourse to Commission—Conversion by Carrier.—The necessity of going to the Interstate Commerce Commission for rectification of a wrongful charge by the carrier, before action can be maintained for relief on account thereof, has no application where, though the reasonableness of demurrage charges was questioned, the consignee unconditionally offered to pay all charges, and the carrier refused the money and sold the goods, and the action is for the conversion.

Before Memminger, J., Bamberg, November term, 1916. Affirmed.

Action by D. Dowling against the Seaboard Air Line Railway and another. Judgment for plaintiff, and defendants appeal.

Footnote.—Refusal of carrier to deliver goods as conversion, see 50 L. R. A. (N. S.) 1172 to 1181.

The first and second exceptions are:

(1) Because his Honor should have granted the defendant's motion to direct a verdict in its favor on the counterclaim for $104.59, since the undisputed testimony was that plaintiff was indebted to defendant for this sum as a balance due defendant on its freight, demurrage, and storage charges and expense of selling the machinery, as provided by law.

(2) Because his Honor should have directed a verdict for defendant, as requested in his third ground, to wit: Because no claim had been filed within four months as provided in section 3 of the bill of lading. No claim had been filed in writing within four months, as provided in section 3 of the bill of lading; the plaintiff having testified that the refusal to make delivery of the machinery took place on the 16th or 17th of June, 1915, that the sale was had on the 18th of June, and it appearing that plaintiff had filed no claim up until the complaint was filed on the 3d of February, 1916.

The following is the charge of the Court:

Now, gentlemen, when we went into this investigation on yesterday, it seemed to have a great number of complications and of being very difficult to understand; but; like all controversies between people, when you get down to an investigation of them in detail, you generally find that there are some plain and simple questions or issues between the parties; and when it gets in that shape, so that plain and simple questions are to be submitted to the jury, and they find that their difficulty is not very great, and all they have to do is to see what the questions are that are to be decided.

In this controversy here, gentlemen, you will see the claim is made by Mr. Dowling, the plaintiff, that he bought this certain machinery, and that he had it shipped over the lines of the Seaboard Air Line Railway Company, on what is known as an order notify bill of lading, and that he paid for the bill of lading at the bank, and got it in his possession, and lost it, and could not get a delivery of his goods. The very first question to be decided in this case is this, to start

as a basis of the case, is to settle the value of the property in controversy; take that question up first, and say what you will fix the value of the machinery at, and the idea of that is this: That, had Mr. Dowling, in due course, gotten that bill of lading and presented it, in due and ordinary length of time, and the railroad had refused or could not deliver it to him, why it would be the measure of his damages at that time; that is, the value of the property in question, and by that we mean such as it could have been bought for, or be sold for, at the time, what he could have gone out and bought similar property, or property just like it, for, or what could he have sold it for. After you fix that, you go one step further in this case: You will take this bill of lading, which is the contract or agreement between the parties, and follow the terms and conditions of it, because that shows what the stipulations were in reference to the shipment. You will see printed in this bill of lading that the railroad is not called upon or required to deliver property, except upon presentation of the bill of lading. You will find this here: "Tender of this bill of lading, properly indorsed, will be required before delivery of the property." So you will see that there was no duty, on the part of the railroad, under the law, to deliver that property to Mr. Dowling until he could produce this bill of lading. So all of these matters as to the correspondence going on between them, when Mr. Dowling did not have the bill of lading, has very little to do with the case; it being merely an effort of both parties to get the matter adjusted—the railroad to get rid of the property, and Mr. Dowling to get his property.

The question then comes up, when Mr. Dowling did find the bill of lading, and was in position to present it, and to comply with its terms, and thereby get the property from the railroad company, then what is the contention of the parties? Now, Dowling claims that he made an unconditional offer and a tender of the money, a *bona fide* and genuine offer to pay the money, presenting the bill of lading, to

pay such charges and such expenses as the railroad claimed against him; if he did that, of course, it was absolutely the duty of the railroad company to deliver it to him, upon his paying those charges. He claims that all they demanded he offered to pay; if that be so, of course, it was the duty of the railroad to deliver it to him.

Now, however, if it is as the railroad claims, that Dowling did not make an unconditional offer, but brought the money and offered to pay all these charges that the railroad had taxed up against this property, only on condition that they would make certain indorsements on the paper, which they were not required by law to make, then Dowling cannot claim he has complied with the contract, and, therefore, he would not be entitled to get the goods, and the railroad had the right to go on and sell them; and if you find that to be true, then you will find a verdict in favor of the railroad company.

So the question would be, if you decide that Dowling did make the offer in good faith to pay all charges, why then the idea would be this: That he would be entitled to recover in this action the value of the property, which you will fix, diminished, first, by the freight, which there is no dispute about; you will deduct that from the value you will fix, and then you will deduct the newspaper advertising, about which there is no dispute, and then the question open for you would be to fix, under the terms of this paper, a reasonable amount for storage charges of the property, if it was stored. You will first say: Did they comply with the terms of this agreement, in reference to storage? Did they store it? If they did not store it, of course, there could not be any charges for it. You know, of course, what storage means. Now, however, if you decide they did store it, you will fix what is a reasonable storage charge, and then you would put these items together—the freight, newspaper advertising, and reasonable storage charges; and you will deduct that from the amount at which you fix as the value of the

property, and giving Dowling a judgment for that differ-
ence.    That is the whole case.

You will either decide it in favor of the railroad, if he
did not make a *bona fide* unconditional offer to pay what
was legally assessed against the property, if he did not do
that, if he did not made an unconditional offer, then he can-
not get back his property at all, and your verdict would be
for the railroad.    I mean this: If he made an offer only on
conditions which the railroad was not required to perform,
he cannot get back the property, and your verdict would be
for the railroad.    If he made a *bona fide* offer to pay, he
would be entitled to get it back—to get back the property or
its equivalent.    That is all there is in the case.    You will
say: We find for the plaintiff, Dowling, so many dollars, so
much money; or, We find for the defendant.    Now, take
the complaint here, as it sets out all the details, all that Dow-
ling claims, a great deal of which has been eliminated; take
the answer of the defendant, which sets out what the rail-
road claims, and a great deal of that has been stricken out;
take this bill of lading, and any other paper you want in the
case—and go and decide it.    You may retire.

The third section of the bill of lading is:

The amount of any loss or damage for which any carrier
is liable shall be computed on the basis of the value of the
property (being the *bona fide* invoice price, if any, to the
consignee, including the freight charges, if prepaid) at the
place and time of shipment under this bill of lading, unless
a lower value has been represented in writing by the ship-
per, or has been agreed upon, or is determined by the classi-
fication or tariffs upon which the rate is based, in any of
which events such lower value shall be the maximum
amounts to govern such computation, whether or not such
loss or damage occurs from negligence.

Claims for loss, damage, or delay, must be made in writ-
ing to the carrier at the point of delivery, or at the point of
origin within four months after delivery of the property,

or, in case of failure to make delivery, then within four months after a reasonable time for delivery has elapsed. Unless claims are so made the carrier shall not be liable.

*Messrs. Lyles & Lyles* and *J. E. Harley,* for appellants, cite: *As to stipulation of bill of lading with respect to filing claim:* 241 U. S. 190; 91 S. E. 1042; 186 S. W. 8. *Liability of freight:* 70 S. E. 199; 80 S. E. 216; 87 S. E. 702. *Counterclaim:* 233 Fed. 135 and 716; 204 U. S. 426; 202 U. S. 242; 227 U. S. 369.

*Messrs. Carter & Carter,* for respondent, cite:· *As to sufficiency of notice of claim:* 28 Am. & Eng. Enc. of L. (2d ed.) 686, 687, 708. *Conversion:* 5 A. & E. Enc. of L. (2d ed.) 389; 30 A. & E. Ann. Cas. 680; 10 Am. & Eng. Ann. Cas. 1123; 73 Ark. 464; 11 Colo. App. 171; 104 Iowa 599; 59 N. Y. Supl. 297. *Damages:* 19 Colo. App. 222; 69 Mo. App. 481.

October 10, 1917.

The opinion of the Court was delivered by Mr. Justice Gage.

A verdict and judgment for $284.34 for the plaintiff against the defendant; an appeal by the defendant. There are five exceptions, but all were abandoned at the hearing save the first and second. Let those two be reported.

The appeal involves, we venture to think, a misconception of the plaintiff's case. The complaint is *verbose* to a degree; but the plaintiff's testimony, if true, makes a case of bald conversion by the defendant of the plaintiff's goods.

The plaintiff's testimony tends to show this case: That a lot of machinery, worth around $300, was shipped in

November, 1913, from Savannah, Ga., over the defendant's railway, to Olar, in Bamberg county; that the plaintiff had paid for the machinery, and it arrived in good order at Olar early in November, 1913; that the plaintiff lost or misplaced the bill of lading for the goods, and for that reason the defendant (within its rights) declined to make delivery to him; that there was long and fruitless and illaudable correspondence betwixt the parties looking to a delivery; that the plaintiff only found the bill of lading in June, 1914; that the plaintiff then went with that paper to get the machinery; that the defendant demanded the payment, before delivery, of $8.19 freight charges, $98.90 storage charges, and $7.50 advertising charges; that the plaintiff, after some fruitless effort at an adjustment, finally offered to pay all the charges; that the defendant declined to receive the money and to deliver the machinery, but sold it on June 12th at public outcry, pursuant to regular advertisement, for $10.

The charge of the Circuit Court was short, lucid and exceptionally helpful. It ought to be reported. The cause did not at all involve the filing of a claim as prescribed by section 3 of the bill of lading. Let that section be reported.

If the testimony for the plaintiff is true, then the defendant committed a plain breach of the plaintiff's right. The plaintiff has not sued for loss, damage, or delay of the machinery. The plaintiff testified he offered to comply with every demand of the defendant and was refused a delivery. It is the same as if the defendant had accepted the charges and then refused to deliver the machinery. It is true the defendant testified to a different state of facts; and the Court charged the jury that, if that testimony was true, then the verdict ought to be for the defendant. The case made does not come within *Georgia v. Blish Milling Co.*, 241 U. S. 190, 36 Sup. Ct. 541, 60 L. Ed. 948, cited by the appellant. So much for the second exception.

The first exception is also untenable. If the plaintiff's testimony be true, then there was no issue about the three items of charge; there was, therefore, no occasion to go to the Interstate Commerce Commission to rectify a wrongful charge for storage, for that was the chief item of charge. The plaintiff testified he offered to pay all the charges, and the carrier declined to accept payment and to make delivery. The plaintiff testified as follows on that question:

When I found the bill of lading, I went with my teams and hands to get the machinery, and talked to the agent, Mr. Fail. I went the next day after I found the bill of lading. I had continued looking and searching for this paper, and when I found it I went the following day to Olar to get the machinery. I asked Mr. Fail, the agent, to deliver the machinery. I contended that the demurrage charges were not correct, inasmuch as the machinery had not been stored. It had been left out where the rain could come in on it, and it had become a secondhand planer. Q. Where was the machinery? A. At the edge of the shed. Q. The train shed? A. Yes, sir; the train shed, right close to where they had unloaded it from the car. I claimed it was just to release the demurrage charges, but he (Agent Fail) would not agree, and advised me that he had authority to sell it; and then I agreed to pay the demurrage and advertising charges that he might have against it, and take the machinery; that I had my hands and teams there, and wanted to carry it back, and I presented the bill of lading and tendered payment, and he refused it. To begin with, he did not know what it was, and he did not think he had authority to deliver it. Q. State whether or not you requested him to correspond with his superiors. A. Yes, sir. Q. Did he do it? A. I don't know whether he did or not. Q. Did he do it then? A. I asked him to wire for information, and I waited some time for him to get the information. Q. How long did you stay around there? A. I guess two hours or

more.   Q. Did you have to come home without the machinery?   A. I had to come home without it.   Q. State to the jury whether or not you were in earnest ·when you offered him the money to pay the charges they had against it.   A. Of course, I was in earnest.   Mr. Lyles: The. witness did not say that he offered the money.   Mr. Carter: Did you offer it to him?   A. Yes, sir.   Q. After coming home, did you get any communication from him?   A. No, sir.

The plaintiff testified he had $200 in his pocket to pay all charges, and in legal effect tendered it. . On the same issue Mr. Eaves, a former employee and station agent of the Southern Railway for 15 years, testified as follows:

Q. State what conversation passed between them so far as you can—between Mr. Dowling and Mr. Fail—with reference to this machinery, or what was said and done.   A. I went with Mr. Dowling, and he asked the agent what the demurrage charges were, and he said about $100, and Mr. Dowling said something about it being excessive; anyway, Mr. Dowling said he was ready to take the machinery out, and had the bill of lading in his hand, the original bill of lading that you have there, in his hand; I looked it over at the time; this is the one he had.   Q. Did Mr. Dowling present the bill of lading?   A. He presented the bill of lading over the counter to the agent, and offered to pay the demurrage, freight charges, advertising charges, and any charges that had accrued to the shipment.   The agent refused to deliver the shipment, and said he had instructions from his superior officers to sell it, and that he was going to sell it, and would not deliver it under any condition.   Q. State whether or not Mr. Dowling requested him to wire them? A. And Mr. Dowling said he would wait until he got a reply. Q. Did he seem to make any effort in that direction?   ·A. No, sir.

The delivering agent of the carrier admitted that the plaintiff offered to pay all charges; but the witness said the plaintiff demanded of the agent that he should make some

notation on the bill of lading, which he declined to do. The plaintiff denied that, and the Court charged the jury that the agent was within his rights to decline to make any notation. The case of *Texas v. Abilene*, 204 U. S. 427, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075, cited by the appellant, has, therefore, no relevancy to the issue made here.

The judgment below is affirmed.